In re Burton Robert BERMAN and
Sandra Odelia Berman,
Debtors.

Burton Robert Berman, Plaintiff,

v.

Steven L. Hollinger, Defendant.

Bankruptcy No. 98–03327–3F7.
Adversary No. 99–95.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

March 8, 2000.

---

Richard R. Thames, Jacksonville, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Proceeding is before the Court on the Complaint to Determine Dischargeability of a Debt filed by Burton R. Berman ("Berman") on March 23, 1999. Defendant, Steven L. Hollinger ("Hollinger"), filed an answer and counterclaim on April 21, 1999. An evidentiary trial was held on December 2, 1999. Berman did not appear before the Court to prosecute his complaint or defend the counterclaim, despite receiving adequate notice. Upon the evidence presented, the Court makes the

following findings of fact and conclusions of law.

## FINDINGS OF FACT

Berman is a disbarred lawyer who was previously involved in a money-laundering scheme in California. Since his disbarment, Berman has been engaged in various real estate based Ponzi schemes across the country, including two such projects in Kearney, Missouri that form the basis of this litigation. In May of 1992, Hollinger responded by telephone to the following advertisement published in *The Kansas City Star*:

---

### 8.25%

Earn 8.25%, Secured by a First Trust
Deed on Construction of U.S.
Government Sponsored, Rural,
Single Family Housing.

Short–Term Maturities
(120 Day Maximum)

$5,000 Minimum
Limited Availability

Noteholders' Principal Returned From
Proceeds of Government Long–Term
Financing

FURTHER INFORMATION, CALL
**816–453–0800**
or write
U.S. HOUSING CREDIT CORPORATION
4444 North Belleview, Suite 207
Kansas City, Missouri 64116

---

Hollinger's telephone call was directed to Wayne Boyle, the purported President of U.S. Housing Credit Corporation ("U.S. Housing"), who sent the following letter to Hollinger explaining the investment scheme:

Dear Mr. Hollinger:

Thank you for your interest in U.S. Housing Credit Corporation's 8.25% Deed of Trust Investment.

I have enclosed additional information that explains how the program works. You will find that this is basically a simple and straightforward concept. Your money is borrowed to construct a new home that has long-term financing provided by an agency of the U.S. Government.

The builder constructs the home and your principal plus interest is returned to you from settlement when the buyer takes possession in about 90 to 120 days. You are secured by a deed of trust on the property and a note signed by the builder.

Once again, we will not accept your funds until there is a signed contract and the government has issued a conditional commitment for long term financing of the house your funds are used to construct....

Mr. Boyle's letter was accompanied by a description of U.S. Housing which stated that U.S. Housing was a Missouri corporation. In September of 1992, Hollinger decided to invest in the program and called U.S. Housing to inform them of his intent. At this point, Wayne Boyle was no longer with the company. Hollinger was put in touch with Berman, who continued the solicitation process initiated by Mr. Boyle.

In conversations between Berman and Hollinger, Berman implied that U.S. Housing was a quasi-governmental agency and repeatedly assured Hollinger that his proposed investment would be secured by the real estate being developed and that Hollinger would be repaid from the proceeds of pre-approved government insured loans. Berman further stated that no funds would be accepted for investment from Hollinger or other investors until the prospective home buyer had been approved for financing.

In reliance on Berman's representations, Hollinger delivered a check for $75,000 to U.S. Housing and received two "Certificate[s] of Participation and Deed[s] of Trust" which purportedly conveyed to Hollinger a 96.83% interest in a Trust Deed and Note given to U.S. Housing by Mid–City Homes, Inc. on Lot 21 of the Southbrook Subdivision, and a 35.21% interest in a Trust Deed and Note also given by Mid–City Homes, Inc. to U.S. Housing on Lot

18 of the Southbrook Subdivision. Copies of two promissory notes between Mid–City Homes, Inc. and U.S. Housing accompanied the Certificates. Both notes stated on their face that they were secured by deeds of trust given by Mid–City Homes, Inc. to U.S. Housing. The notes and Certificates were all signed by Berman as President of both U.S. Housing and Mid–City Homes, Inc.

At the time of Hollinger's investment and the issuance of the Certificates, Lots 18 and 21 of the Southbrook Subdivision were encumbered by a deed of trust given by Mid–City Homes, Inc.. to Metro North State Bank. Hollinger was not informed of this previous encumbrance of these lots.

Contrary to Berman's representations, no deeds of trust ever existed between the developer, Mid–City Homes, Inc., and U.S. Housing. There was also no indication that either Mid–City Homes, Inc. or U.S. Housing had obtained a pre-approved buyer for either Lots 18 or 21 prior to accepting Hollinger's money. The proceeds from Hollinger's $75,000 investment were deposited into a bank account at Brotherhood Bank and Trust in Kansas City, Missouri. From there, the funds were transferred to Mid–City Homes, Inc.'s account, also at Brotherhood Bank and Trust, and then used primarily to pay "payroll" to Berman and others, as well as personal car payments and credit card bills. Noticeably, there were no payments related to the construction of single family homes.

From there, other portions of Hollinger's money were transferred to Southbrook Mortgage Associates, another investment scheme operated by Berman, to make "interest" payments to investors in that investment program. The Southbrook Mortgage Associates scheme was similar to that in which Hollinger invested. Investors in Southbrook Mortgage Associates were promised a return on their investment secured by deeds of trust on the same property allegedly securing Hollinger's investment.

The stated maturity date of the investment loans made by Hollinger expired without any sums being repaid to him. Thereafter, Hollinger had several telephone conversations with Berman concerning his investment, only to be told that the project was "running behind" but was still in progress. In each instance, Berman assured Hollinger that he would be repaid his entire principal, plus interest.

Berman, as President of Mid–City Homes, Inc., conveyed Lot 21 on November 10, 1993 and Lot 18 on December 7, 1993, both to Task Service Corporation.

Hollinger continued to speak with Berman through the Spring of 1994 concerning the return of his money. Berman never informed him of the sale of the property and continued to offer Hollinger false assurances of repayment. After failing in his efforts to recover his investment, Hollinger commenced an action on October 18, 1996 against Berman and his associates in the Circuit Court of Clay County, Missouri seeking damages for fraud, misrepresentation, malicious injury, conspiracy, and racketeering activities. The case was removed to the United States District Court for the Western District of Missouri, Western Division (the "RICO case"), and remains pending.

Hollinger has since visited the property and confirmed that no dwellings were built on Lots 18 and 21. Corporate record searches reveal that, contrary to the solicitation materials furnished to Hollinger, U.S. Housing never incorporated in Missouri. Additionally, U.S. Housing and its principals were under investigation in Kansas for securities violations as early as June of 1993.

On April 24, 1998, Berman filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Berman did not list Hollinger as a creditor in his bankruptcy schedules nor did he list the RICO action in his Statement of Financial Affairs. Berman's bankruptcy case was administered by the Chapter 7 Trustee as a no-asset case and discharge was entered on

October 16, 1998. Subsequently, Berman moved to reopen the case to add Hollinger as a creditor and file this adversary proceeding to determine the dischargeability of the debt owed to Hollinger. Berman claimed that the debt to Hollinger was discharged because this was a no-asset case making actual notice to Hollinger irrelevant. Hollinger's first notice of Berman's filing for bankruptcy was the service of the summons in this adversary proceeding. Hollinger timely prepared and filed a counterclaim requesting that the debt owed to him be excepted from Berman's discharge. The counterclaim also sought revocation of Berman's discharge for failing to list the pending lawsuit or his interests in Mid–City Homes, Inc., U.S. Housing and Kearney Land & Cattle Company on the schedules.

An evidentiary trial was held on December 2, 1999. Berman was not present to prosecute his complaint and the Court dismissed Berman's complaint for lack of prosecution and proceeded upon the trial of Hollinger's counterclaim. Hollinger elected to proceed solely on the § 523 counts and did not prosecute the § 727 revocation of discharge claims.

## CONCLUSIONS OF LAW

■ Section 523(a)(2) and (a)(6) of the Bankruptcy Code provide in pertinent part that:

(a) A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523. In order to except a debt from discharge under § 523(a)(2), an injured party must prove that the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; the creditor's reliance was reasonable; that the creditor sustained a loss as a result of the representation. *In re Cram (Mendez v. Cram)*, 178 B.R. 537, 540 (Bankr.M.D.Fla.1995), *citing In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986). Hollinger has the burden of proving the debt should be excepted from Berman's discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

■ The facts of this case satisfy the elements of § 523(a)(2) by the necessary burden of proof. Advertisements utilized by Berman and his cohorts falsely imply that U.S. Housing was affiliated with the United States Government and that the loans would be secured by deeds of trust on real estate owned by the developer, while no such deeds of trust ever existed. Additionally, the issuer of the Certificates, U.S. Housing, was a non-existent entity and there were no pre-approved buyers for the lots allegedly securing Hollinger's investments. Hollinger's investments were not used to construct low-income housing. Those monies were used for Berman's personal benefit and to help support the Southbrook Mortgage Associates' Ponzi scheme. Berman was a knowing participant in these schemes, and knowingly made false representations to Hollinger for the purpose of obtaining his money. Hollinger relied on Berman's representations in making the investments and postponed taking any action to recover the money based on Berman's repeated assurances that payment would be forthcoming.

The Court finds that Hollinger's reliance on Berman's representations was reasonable. The proposed rate of return of 8.25% was not too good to be true, but was instead consistent with rates of return being offered on legitimate investments of this nature. The advertisements also sug-

gested an affiliation with the United States Government, which may have provided potential investors, such as Hollinger, additional comfort. Finally, Hollinger sustained a $75,000 loss in reliance on Berman's representations and costs in pursuing his claim in Missouri and before this Court.

Accordingly, the Court finds that the elements necessary to sustain an exception to discharge have been established and that the debt owed to Hollinger should be excepted from Berman's discharge pursuant to § 523(a)(2).

Hollinger's counterclaim also seeks damages for Berman's violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., and a determination from this Court that any award of treble damages, attorneys fees and costs issued in the pending RICO action are likewise excepted from the debtor's discharge.

▪ Treble damages, attorney fees, and costs awarded pursuant to RICO are non-dischargeable under § 523(a)(2)(A). *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1988). The Court will not liquidate any RICO claim in this adversary proceeding or make any factual findings related thereto out of concern for the litigation pending in Missouri. The Court does, however, conclude that the debt owed by Berman to Hollinger, including any liability under RICO statutes, as determined and fixed by the Missouri District Court, shall be excepted from Berman's discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

▪ Section 523(a)(6) of the Bankruptcy Code also applies in this instance. Under this statute, any debt constituting a "willful and malicious injury" to another will survive a debtor's discharge. 11 U.S.C. § 523(a)(6) Theft constitutes a willful and malicious injury. *In re Berghman,* 235 B.R. 683, 692 (Bankr.M.D.Fla.1999). In this case the facts are clear that Berman took Hollinger's money with the in-

tent to permanently deprive him of that money. The Court finds that the facts of this case support an exception of the debt owed by Berman to Hollinger pursuant to 11 U.S.C. § 523(a)(6).

## CONCLUSION

Often the facts surrounding an investment scheme present a situation which is too good to be true. In such situations, one often wonders how the greedy investors, who end up losing their entire investment, could have fallen for the brazen promises and guarantees of riches to come. In this case, however, the proposed return was not too good to be true. In fact, the investment scheme, which appeared to be backed by a governmental entity, offered a reasonable rate of return and Hollinger's investment in the fraudulent scheme was not unreasonable.

Hollinger set forth clear and convincing evidence that Berman obtained funds from Hollinger by false pretenses, false representations, and actual fraud. The Court finds that Hollinger reasonably relied to his detriment on the materially false statements presented by Berman. Accordingly, any debt owed by Berman to Hollinger, including any liability under RICO Statutes as determined by the Missouri District Court, is excepted from Berman's discharge pursuant to 11 U.S.C. § 523(a)(2) and (a)(6).